Good morning, Your Honors. Christopher Muzzi on behalf of the appellant, Mano-Y&M, Ltd. Your Honor, the Bankruptcy Court's finding that Mano was the initial transferee of the fraudulent transfer is incorrect. I submit to Your Honors that there's three good reasons why this Court should reverse the Bankruptcy Court. First, the Bankruptcy Court misapplied the Dominion Test and ignored key facts and essentially collapsed a multi-step transaction into a single-step transaction. Second, the ruling, the result of the ruling is contrary to the Congressional intent that's set forth in Section 550 of the Bankruptcy Code. That is, Section 550 imposes strict liability on an initial transferee because that transferee is the one that is in the best position to monitor the source of the funds and the transaction. A subsequent transferee generally doesn't have the ability to monitor the source of the funds and even if they did, they're not an effective monitor. Well, that may be the logic behind Congress's enactment, but the enactment doesn't say that a transferee is strictly liable if it was in a position to monitor the source of the funds. Instead, what the statute does is draw a line between the initial transferee and the subsequent transferee and I think you've offered up the logic for why Congress drew that line. But the line it drew did not contain as a component that piece of the logic. That is, it doesn't say an initial transferee is strictly liable if it was in a position to monitor the source of the funds. It simply says initial transferee is strictly liable. That's correct, Your Honor, but I guess the bonded court and then the court in Video Depot kind of cross-checked their result by saying, okay, this person received the transfer. For example, in the Video Depot case, it was a transfer. Hilton had received a check that was drawn from the debtor's account and not the person that owed Hilton the money. So the court kind of cross-checked and said, well, Hilton should have been put on inquiry notice that this check isn't from the person that owes him the money. So I think it can be used… Well, where did the money come from here? Well, in this particular case, the money came from the mortgage store. That's the debtor. It came from the debtor, but it also went to Mr. Freeland, who pursuant to a HUD-1, a settlement statement that had been signed by all the parties, had agreed on behalf of George Lindell, the principal of the debtor, that he would receive funds to hold for Mr. Lindell and disperse in accordance with the instructions that Mr. Lindell gave in that settlement statement. And that's what happened in this case. And I think one of our biggest arguments with the bankruptcy court is the bankruptcy court essentially collapsed that transaction and said that at the moment the debtor parted with those funds, Mono had dominion over them. And I think that is inconsistent with the facts because the amount of the transfer was, I think, $311,065.25. And that amount was to pay Mr. Lindell's entire closing costs, which included the balance of the purchase price, and it also included about $35,000 of additional closing costs that were the obligation of Mr. Lindell. So when you do apply the dominion test, and I think everyone's in agreement that in common that sets forth the dominion test is what is applied to determine whether someone's a transferee. When you apply that dominion test to the facts of this case, you know, the bankruptcy court said the minute it left the debtor, Mono had dominion over that money. But it didn't. There's no way it could have applied that entire $311,000 to its own uses. It had no ability to direct Mr. Freeland to transfer the closing costs that Mr. Lindell. The closing costs raised a different issue with regard to whether whatever the smaller piece was, that claim has been waived. But you accept as a premise that somebody had dominion over it, and if it wasn't your client, who was it? Well, there can be multiple people that have dominion. The question is who had it first. Well, is there a point in time where dominion changed? I mean, we're looking now at the time when the wire transfer comes from the mortgage store account to the attorney in Texas, and nobody's arguing that the attorney in Texas is the person with dominion. So who had dominion at that point in time? At that point in time, George Lindell. George Lindell was the principal of the debtor, but he was the contracting party that was going to purchase the property from Mono. Could he have told, I've now forgotten the attorney's name. Mark Freeland. Could he have told Mr. Freeman, send me that money? No. Well, then how is it he had dominion? I mean, dominion is going out and being able to buy lottery tickets. Could Mr. Lindell have gone out and bought lottery tickets with that money? Well, the reason we're getting to this is the McCarty case, the presidential case where the Ninth Circuit BAP had a very similar circumstance where there was an escrow that was set up, there was a principal that directed the debtor to pay the balance of the purchase price into the escrow. And the Ninth Circuit BAP looked at that situation and said, okay, he can't change his mind, but he has given instructions on how that money is to be used. And the same thing happened in this case. Mr. Lindell has given instructions to Mr. Freeman on how that money is to be used, and it's to be used for Mr. Lindell's benefit. And that's why we're saying that the McCarty case is pretty close to the situation that we have here. It's a little bit different because the person the trustee was trying to recover from was the seller's broker. But in this particular case, it's the same situation where you have a principal that causes the debtor to transfer money into an escrow. And the court found that that money went to the principal to pay the balance of the purchase price, escrow received on his behalf. And even though he couldn't change his mind or demand it back, he exercised dominion over that because he directed what would happen. So even though it went there to Mr. Freeman, Lindell still had dominion over that money. And then subsequently, when the transaction closed and the funds were dispersed, then it can be treated as a transfer from Mr. Lindell, and that's what the settlement says, that Mr. Freeland is going to disperse the funds that were received on Mr. Lindell's behalf to Mono and to others that are set forth in that settlement statement. So it is a multi-step transaction that essentially Mr. Freeland gets disregarded twice. There's the transfer to Mr. Freeland where it's received on behalf of George Lindell, the debtor's principal. And then when the conditions of closing are met and there's a disbursement, there's again a transfer by Mr. Freeland essentially as a conduit to Mono. And at that point, Mono becomes a subsequent transferee and then at that point would have the ability to assert a defense that they took for value and in good faith and without knowledge of the avoidability of the transfer. So, Counsel, what is the strongest case authority you have for the proposition that Mr. Lindell maintained control of the money at the time it was placed with this attorney? Tell us what case supports your argument most strongly. Yes, that's the McCarty case, and I can get the citation. Okay, that's fine. I'm familiar with that. So you think McCarty supports your argument? McCarty. The trustee tried to raise the argument that the incumbent case overruled McCarty, and it's our position that it was not overruled. Incumbent at the Ninth Circuit BAP, which was reversed by the Ninth Circuit, the BAP cited McCarty as an example of a situation that wasn't applicable to the incumbent case, but it was cited by the BAP and was not discussed and not specifically overruled by incumbent when they set forth the dominion test. In incumbent, they basically said that the dominion test applies irrespective of whether you're dealing with a conduit case, a financial intermediary case, or a case where you're just trying to determine who the transferee is. But there was no specific overruling. Well, are you saying that's the only way a case can get overruled? No, that's not. By a higher court saying we overruled McCarty? That's not what I'm saying, Your Honor. I'm saying the trustee has argued that it was overruled by incumbent, and we're saying that, no, it still has continuing validity, that if you apply the incumbent dominion test to the facts of this case, which we're all agreeing is the applicable test, that you still reach the same result that you would have reached in McCarty. Who was it? Was it the real estate agent in McCarty that was held to be the initial transferee? Well, the seller's broker, the trustee was trying to recover from the seller's broker, who had been paid out of escrow. And what the court found is that the payment was not, or the seller's broker was not the initial transferee, that the debtor's principal, Mr., I think, McCookian, was the initial transferee because the money had been received into escrow on his behalf and then later dispersed according to the instruction. Now, how does that speak to the facts of this case? I mean, given that you've acknowledged that Mr. Lindell was not free to direct the funds and so in that sense may not have had dominion over the funds, what in McCarty or in presidential tells us that he should be deemed to be the initial transferee in this case? I think McCarty went into the analysis that you're asking about now, that when you have an escrow transaction and you may be committed to close, that doesn't mean that you don't have dominion over the funds. It basically said that, look, look at the facts and here's what happened, that the debtor's principal directed that the money go into the property. He made the choice as to how it would be expended. He gave the instructions on what to purchase. He was going to be the owner of the property after the closing and that this amount of dominion, even though he couldn't change his mind regarding the transaction, still meant that he had dominion over those funds and that he was the initial transferee. So, counsel, you're aware, though, that we are not bound by rulings of the Ninth Circuit Pat? Yes, Your Honor. Go ahead. I was just going to say I think it provides a framework to look at because I think the reasoning is strong and it's a situation that I think gives full effect to the facts. One of the things that I haven't had the opportunity to bring up now is this ruling actually creates a lot of danger to commercial transactions throughout the country. This situation that happened to Mono could happen to anyone. It could happen to your honors. It could happen to people's parents. And what is being asked for by Mono in this case is simply the ability to be able to assert a defense because it's not in that position where under 550 where strict liability should be imposed. And it all fits together because there is a legitimate factual basis that the money was first received by Mr. Lindell and then it was subsequently transferred. But in a way you're asking us to suspend reality and say that the money was really not in the control, was not in the dominion of the person who's going to get it. No, I don't think I'm asking you to suspend reality because if we had a situation where escrow didn't close, the money would go back to Mr. Lindell. But we don't have that situation, though. Well, we don't have that situation, but that is what would have happened under the general law of escrows if it hadn't closed. Everything that was required as a condition for the escrow to close had occurred in this case. Well, first of all, I don't think that the trustee met his burden on that. There's evidence that a deed was signed on the 20th and it's not clear which went first, the money or the deed. So, you know, I don't think the trustee has met that burden. And then just when we get to summary judgment, how the inferences are supposed to be in the favor of the non-moving parties, I don't know that we're necessarily there. But in this particular case, even after the money was paid in, the transaction does not close immediately. The escrow agent has to make sure that all the documents are there, that everything's in order, that the funds get dispersed as required. But didn't all of that happen, though? No. The record shows that the money came in on the 20th. Some of the deeds were signed on the 20th. Disbursements were made the following day. So are you making a distinction between when the monies were supposed to be dispersed and when they were actually dispersed? I don't understand what your point is. If everything happened the way it was supposed to and the money was actually dispersed. I don't understand. I think that's one of the problems with the court's reasoning, is that we start to get into the case where we have to try and make distinctions. I think the facts fit well where you don't have to make a distinction. You know, did the money come in a minute before the deed? Did it come in ten minutes before the deed? Because the facts do show, and like the presidential case, and there's another case that we cited, Elephant & Sons v. Bestworth, where you have these escrows, it is legitimate and not a distortion of the facts to be able to say that that money was received in escrow on behalf of, in this case, George Lindell. So whether the money came in a little bit before or a little bit after, those distinctions are the danger in the court's ruling. All right. Thank you, counsel. Thank you. You've exceeded your time, but we'll give you a minute or two for rebuttal. Thank you. Let's hear from the opposing counsel. Thank you. May it please the court, Simon Klevansky and Nicole Stuckey appearing on behalf of Dainfield, the trustee of the mortgage store, as appellee. Your Honor, as the court knows, both the bankruptcy court, each of the bankruptcy court and the United States District Court, determined that on the date at the time of the debtor's transfer of funds, Mono was entitled to the funds according to the contract because the inspection period had passed. That is to say, the effective date of the contract, the latest possible effective date of the contract was December 16, and with a 30-day inspection period, the inspection period had expired on January 15th, the following month, and thus when the funds were transferred by the debtor to Mono's attorney, it was actually transferred to the trust account in the name of Mono, held by Mono's attorney, each of the courts found that Mono was entitled to those funds just as Lindell, under the contract, was entitled to get the property. I'm sorry. So opposing counsel, when I ask him the question about whether or not all of the conditions had been satisfied for the escort of clothes and the money to be transferred, he took issue with that. Why is he wrong about his argument that there were still conditions that needed to be satisfied before the transfer of funds was complete? He is wrong because each of the parties to the contract had certain entitlements at that point. Judge Seabright has found, Judge Farris has found, at that juncture. At what juncture? At the time the funds were transferred. Into the? Into the client trust account of Mr. Freeland in the name of Mono, as it turned out. The record shows that that's the name on the client trust account, that Mono was entitled to be paid. He would be entitled to a specific performance if he had not been paid, and by virtue of the same result, Lindell would have been entitled to get a deed. Whether he got the deed or not, he had accrued an entitlement, and Mono Y&M had accrued an entitlement to get those funds. So under the principle enunciated by this court, the court in ComNet, and adopted, you know, followed by the bankruptcy court and the district court, that some party must have dominion in a transaction that the correct, you know, conclusion is that Mono, of the two parties to the contract, had dominion over the funds when they were received by Mr. Freeland. So what about opposing counsel's observation that what would happen if escrow never closed? There would be no dominion. What's your response to that observation? Well, we take issue as to whether it was a true escrow. I mean, that is, they have constructed a concept that Mr. Freeland was an escrow. I don't mean to go aside to the argument, but he was not licensed to serve as an escrow. There was no escrow agreement. And putting that aside, if the transaction for some reason had not gone forward as it did, as the court has observed it did go forward, then Mono would still be entitled to those monies because it had accrued that entitlement, and Mr. Lindell would have been entitled to get the deeds. Suppose Mr. Lindell filed his own chapter, filed bankruptcy. Suppose he was run over by a bus or suppose the mall burned down. I mean, aren't there things that could have happened that would have interrupted the transaction? Well, I assume that if he had filed bankruptcy, it would have been Mr. Mono's, I'm sorry, Mono Y&M, Mr. Monoharan was the principal. It would have been Mono Y&M's position that having received the monies it was entitled to the monies and it would be prepared to convey the deed to the Mr. Lindell's bankruptcy trustee or his estate as it were. The transaction hadn't closed? Well, I think following Judge Rawlinson's observation, there's no reason the transaction would not have closed. That is to say, the... Well, it just offered some reasons. Suppose there was a bankruptcy filing or suppose it burned down or suppose he was killed. Aren't there lots of things that could have interrupted the transaction? Well, that is questionable. That is to say, I understand any of those things theoretically could have happened, but I think Monoharan or Mono Y&M would have taken the position that having entered into an agreement, it was entitled to the benefit of the agreement, it was entitled to the money, and it was prepared to convey the property to a trustee or an estate or whoever. So I don't think that Mono Y&M would have sacrificed the benefits of the deal it had made, having received the monies, having the monies in the hands of its attorney. I don't think it would have readily sacrificed its position based on extrinsic events. So I think that, once again, on the presumption, as is the presumption in ComNet and the presumption made by Judge Seabright and Judge Farris, that someone has dominion, that the correct conclusion reached by the courts below is that Mono Y&M had the dominion over those funds when the funds were transferred. Now, if I may respond to the issue of McCarty, because that's been raised, and I think it can readily be disposed of in three ways, as Judge Seabright has done in his opinion. First of all, I concur with, I think, the implication of Judge Kishima's observation that a decision may be supplanted, even if it is not expressly overruled. And ComNet, if you will, supplanted the decision in McCarty because McCarty adopted a hybrid of dominion or control test that was rejected expressly. The test was rejected in ComNet. Secondly, the McCarty case turned on an issue of Washington law. And thirdly, and this is material to the argument that's been made by counsel, in McCarty, and I'm quoting from McCarty on, I think it is, sorry, it is page 238, 180 bankruptcy 238 of that opinion. The court says, prior to the conditions being met for the funds to be transferred to the buyer, the escrow agent holds the funds as the agent of the buyer. And I'll take a moment to note the court is looking for that language. So, first of all, you take issue with the comparison to an escrow agent because, in your view, the attorney in this case was not authorized to and was not acting as an escrow agent. He was not licensed. He had not executed agreements that are required under Texas law. And he, with the two parties, since he was an agent for one, and so he could not act as an escrow. He did not act as an escrow. We think that's a construct that they have created to take advantage of the McCarty case. Secondly, as I said, the McCarty case has been supplanted by ComNet. And thirdly, in the facts, because I don't know that the result should or should not have been different in McCarty. We're not here to litigate that case. But in that case, the monies were transferred to a real escrow prior to the conditions being met. So, for instance, they would have a different argument if the $311,000 was wired before January 15th when Mr. Lindell had the inspection period was still ongoing. And he had a right, arguably, to cancel the transaction. But under the undisputed terms of the agreement, that inspection period had expired on January 15th, six days before, five days before the funds were transferred. And both the Bankruptcy Court and the District Court held that those conditions having been met, when the funds were transferred, the funds were transferred directly to the Dominion of Mono Y&M. Could you speak to Appellant's argument as to the broader implications of this, either in terms of the logic behind the statute or the impact upon other commercial transactions? I look at this. Why should Mono have any reason to think or consider the need to investigate the mortgage store? They probably didn't even know the mortgage store was involved in this transaction. Actually, they were represented by counsel. I mean, the documents make clear that Mr. Freeland was Mono's attorney at all times, before, during, and after this transaction until today. And the funds were wired. The wire transfer, which is part of the record, reflected the funds were coming from the mortgage store. So Mr. Freeland, as counsel for Mono, had reason to know the funds were coming from somebody else. Well, but they could be coming from someone else in lots of ways. And frankly, if I were in his position, I would have inferred either this is a loan to Lindell or Lindell is entitled to payment for something. I don't think it would occur to me, if I'm sitting in the position of Mono's attorney, for what's not the world's largest transaction, that I'm suddenly going to have to investigate the mortgage store, whose name I learn about because their name happens to appear on a wire transfer. That is correct. I agree with Your Honor on that. But what I was saying was that, in fact, he was not completely without notice. And he could have investigated. He elected not to, and it may have been in the ordinary course of business that he would not. Well, that's the concern for commercial transactions. If any attorney has to investigate the source of funds and consider the financial stability of the source of funds, doesn't that throw a wrench into a lot of transactions? Well, some yes and some no. I mean, ordinarily, particularly if you're represented by counsel, counsel will want to understand if there's a third party involved in the transaction, what the nature of their involvement is. Generally, they were taking back, in effect, seller financing. They were providing the financing to Mr. Lindell. Generally speaking, an ordinary lender will not accommodate junior financing, which may demonstrate that the borrower has no equity, has no skin in the game. But putting that aside, I guess I would say, and I think it's implied in the Court's earlier comment, that avoidance claims can have harsh consequences to someone. That is a consequence. But nonetheless, if you do not have avoidance recoveries by a trustee, there are harsh consequences to the creditors of the estate from which the funds are transferred. And it is the judgment of Congress, and it is the effect of avoidance claims, that the playing field is even between existing creditors and some third parties by providing for the avoidance of transfers under certain conditions. And those conditions, I suggest, are met here. Are there imperfections in any given result? That is possible. Now, having said that, I would observe that in balancing, and the argument of equity is occasionally raised, that in balancing the equity between a trustee and a transferee, the trustee is presumed, irrevocably presumed, to be a perfect creditor who is entitled to exercise those rights against which there are no equitable defenses. And in this particular case, where the victims of the Ponzi scheme are basically people who were retirees and families whose life savings were placed in the hands of the mortgage store, and third-party commercial parties such as Mono, Y&M, that were represented by counsel throughout the transactions, they had a greater ability to examine them. Is there a risk in any given possible transaction? There is always some risk. I understand the point you're making, but I'm not sure that I could agree they have a greater ability. I mean, the worthy people left holding the bag at least knew they were dealing with the mortgage store. I'm not sure that can fairly be said about Mono. Well, Mono had received a cash portion of a purchase price. It retained a mortgage on the property. It had its own claim against its borrower, Mr. Lindell, and it had the ability to structure what protections it deemed to be in its interest. And if it failed in this instance, it is a consequence of the law that they are required to return the cash portion of the purchase price which came from someone else. Thank you, counsel. Thank you. Thank you. We have two minutes for rebuttal. Thank you, Your Honors. I think the Court is aware, and I can see from the questions, that there are larger concerns beyond this case. The Video Depot case, that's the 127F3rd at 1195, and at page 1197, they start their analysis as to whether or not someone was initial transferee or subsequent transferee by looking at the statutory scheme including Section 550. And the reason is there isn't a definition of transferee in the code. So I think it is important to look at why Congress enacted Section 550 and why it assigned strict liability to certain people and why other people have the opportunity to raise defenses. One thing that the Court's ruling had done that I think is different than what was argued by the trustees' counsel is the Court's ruling was as soon as that transfer was made, as soon as it left the debtor's account, it was under the dominion of mono. So under those circumstances, there is absolutely no opportunity to determine the source of the funds or whether or not there's a potential fraudulent transfer because under the Court's ruling, it's immediate. As soon as it got wired, mono had dominion. And I don't think that that is fair or appropriate, and it's not necessarily consistent with the facts of the case. And again, with respect to the broader picture, there are probably millions of real estate transactions every year where there's sellers, and it's not uncommon that the last thing to happen is the funding. And under this Court's ruling, sellers, millions of sellers, could potentially be strictly liable. In some cases, in the equities that the trustees tried to bring out, you could have innocent homeowners who received some cash, and now they're being told that they're strictly liable to return that cash because it came from a source that they didn't know about. And even if they had known that it came from the mortgage store, they wouldn't have had any reason to question it. All right. Thank you, counsel. Thank you. Thank you to both counsel. The case is submitted for decision by the Court. Has Mr. Bassett arrived? All right. We'll trail the case of FK v. State of Hawaii Department of Education, and we'll hear next, Cabossi v. VSC Corporation. Thank you. When you're ready, counsel, for appellate, please approach and proceed. Good morning, Your Honors. Curt Hamrock, McKenna Long & Aldridge, Washington, D.C., on behalf of Appellant VSC Corporation. With me at counsel table is Ralph O'Neill, also representing VSC. I'd like to reserve three minutes, if possible, for rebuttal. Your Honors, in April 2011, terrible tragedy occurred, resulting in the death of several fine individuals. The question today is whether the litigation arising from that incident should be heard in state court or in federal court. VSC Corporation asserts that the federal footprint over the events leading up to this incident is sufficiently great that the case should be heard in federal court.
judges: Tashima, Rawlinson, Clifton